UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**HERBERT BAYLOR,**<br><br>Defendant. | Crim. Case No. 25-87-TSC |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

Herbert Baylor broke the public trust by violating his official duties for personal financial gain at the expense of those he was supposed to be assisting—the population of the D.C. Department of Corrections ("DOC"). Mr. Baylor smuggled dangerous contraband, including controlled substances, into the D.C. Correctional Treatment Facility ("CTF") for money from a detainee who had been convicted separately of Sexual Assault and Murder. An audit of the D.C. Jail during the period of Mr. Baylor's offense found the rate of overdose deaths at the facilities to be 10 times the national average at U.S. jails. Ex. 1. During the audit period, there were also 76 incidents of contraband drugs recovered and Narcan was administered 148 times. *Id*. These shockingly high numbers underscore the seriousness of Mr. Baylor's actions. In consideration of the factors set forth in 18 U.S.C. § 3553(a), the Court should impose a guidelines sentence at the bottom of the applicable range, which if this Court adopts the Government and Probation's calculation, is 24 months incarceration. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

**I.     Background**

CTF is a correctional institution operated by the DOC. CTF is located adjacent to its sister facility, the Central Detention Facility (CDF), a second correctional institution operated by the

1

DOC. CDF is used to house adult male detainees awaiting trial, serving a misdemeanor sentence, or in transit to a Bureau of Prisons facility. CTF is a specialized medium security penal institution that houses inmates requiring specialized medical treatment or treatment and monitoring related to substance dependencies.

The D1A housing unit at CTF houses detainees who are 50 years or older. From December 19, 2022 through September 23, 2024, Mr. Baylor was a case manager employed by DOC to assist and manage resident inmates at CTF, including Inmate-1. Baylor had an office at CTF located on the D1A men's housing unit that contained a DOC-provided computer and office phone for Baylor's use in carrying out his assigned duties. As a DOC employee, Mr. Baylor was governed by the DOC Contraband Control Policy, which indicates that trafficking contraband of any kind to inmates is strictly prohibited.

In July 2024, investigators received information regarding a contraband smuggling ring, involving Mr. Baylor, Inmate-1, and a confidant of Inmate-1 named Pamela Porter. *See* Sealed Ex. 2. Specifically, investigators learned that Inmate-1 would direct Ms. Porter over the phone to discretely fit contraband into a cigarette carton. *Id*. Ms. Porter would give the cigarette carton containing contraband to Mr. Baylor to smuggle into CTF. *Id*. Mr. Baylor would then smuggle the contraband into CTF and deliver it to Inmate-1 in exchange for payment, using either cash or a peer-to-peer payment application such as CashApp. *Id*. Inmate-1 would then sell the contraband to other detainees. *Id*. The contraband included Xanax, "fake Percocets," suboxone strips, crack-cocaine, and synthetic marijuana. *Id*. Investigators were informed about a specific incident in Spring 2024 where a significant number of pills were inside of a cigarette carton brought by Mr. Baylor to Inmate-1. *Id*.

Investigators set out to corroborate this information. Phone records obtained from Mr. Baylor's office phone showed 106 calls between that phone and Ms. Porter's phone between January 5, 2024 and June 21, 2024. Phone records from Mr. Baylor's cell phone showed 20 calls or text messages between Baylor's cell and Ms. Porter's phone between January 16, 2024 and June 18, 2024.

Records from CashApp showed that Mr. Baylor received $7,995 in CashApp payments from either Ms. Porter or a family member of Inmate-1 between October 20, 2023 and June 21, 2024.

| Date | Total | Sender | Action | Recipient |
|---|---|---|---|---|
| 2024-06-21 13:14:07 | 300 | Pamela Porter | Paying | Herbert |
| 2024-06-11 13:44:12 UTC | 50 | Pamela Porter | Paying | Herbert |
| 2024-06-10 23:07:52 | 150 | Pamela Porter | Paying | Herbert |
| 2024-06-10 23:00:54 | 150 | Pamela Porter | Paying | Herbert |
| 2024-06-10 23:00:07 | 150 | Pamela Porter | Paying | Herbert |
| 2024-06-05 20:22:26 | 200 | Pamela Porter | Paying | Herbert |
| 2024-05-30 18:39:10 | 150 | Pamela Porter | Paying | Herbert |
| 2024-02-07 16:26:49 | 200 | Pamela Porter | Paying | Herbert |
| 2024-02-03 04:35:04 | 150 | Pamela Porter | Paying | Herbert |
| 2024-06-18 02:39:31 | 250 | | Paying | Herbert |
| 2024-06-13 16:57:10 | 250 | | Paying | Herbert |
| 2024-06-02 13:18:16 | 150 | | Paying | Herbert |
| 2024-05-30 18:19:21 | 150 | | Paying | Herbert |
| 2024-05-27 21:21:32 | 150 | | Paying | Herbert |
| 2024-05-24 17:17:21 | 150 | | Paying | Herbert |
| 2024-05-23 20:55:24 | 150 | | Paying | Herbert |
| 2024-05-20 22:28:49 | 250 | | Paying | Herbert |
| 2024-05-16 22:24:43 | 150 | | Paying | Herbert |
| 2024-05-15 13:41:44 | 150 | | Paying | Herbert |
| 2024-05-14 02:36:30 | 150 | | Paying | Herbert |
| 2024-05-12 19:09:01 | 150 | | Paying | Herbert |
| 2024-01-31 22:56:35 | 150 | | Paying | Herbert |
| 2024-01-23 01:28:13 | 150 | | Paying | Herbert |
| 2024-01-22 02:29:07 | 150 | | Paying | Herbert |
| 2024-01-10 12:13:08 UTC | 150 | | Paying | Herbert |
| 2024-01-08 23:58:36 | 150 | | Paying | Herbert |
| 2023-12-22 18:25:20 | 150 | | Paying | Herbert |
| 2023-12-21 17:16:34 UTC | 100 | | Paying | Herbert |
| 2023-12-19 17:35:56 | 150 | | Paying | Herbert |
| 2023-12-14 16:06:51 UTC | 800 | | Paying | Herbert |
| 2023-12-07 17:01:36 | 200 | | Paying | Herbert |
| 2023-12-07 01:13:58 | 150 | | Paying | Herbert |
| 2023-12-01 20:51:59 | 300 | | Paying | Herbert |
| 2023-11-30 17:36:57 | 150 | | Paying | Herbert |
| 2023-11-21 20:38:56 | 150 | | Paying | Herbert |
| 2023-11-13 18:35:31 UTC | 75 | | Paying | Herbert |
| 2023-11-09 20:28:34 | 97 | | Paying | Herbert |
| 2023-11-05 15:14:55 UTC | 200 | | Paying | Herbert |
| 2023-11-03 17:49:18 UTC | 245 | | Paying | Herbert |
| 2023-10-30 17:38:31 | 247 | | Paying | Herbert |
| 2023-10-27 20:10:13 | 150 | | Paying | Herbert |
| 2023-10-24 21:34:55 | 140 | | Paying | Herbert |
| 2023-10-24 21:33:54 | 140 | | Paying | Herbert |
| 2023-10-20 21:00:16 | 100 | | Paying | Herbert |
| 2023-10-20 20:58:27 | 100 | | Paying | Herbert |
| 2023-10-20 20:06:21 | 1 | | Paying | Herbert |
| | $7,995 | | | |

Contemporaneous with payments to Mr. Baylor by Ms. Porter and Inmate-1's family member were payments from other detainees or their representatives to Ms. Porter and Inmate-1's family member, suggesting that the contraband was trafficked once inside the facility. For

3

example, on February 7, 2024, Ms. Porter paid Mr. Baylor $200. On that same day, Porter received $1,100 from another detainee at CTF.

For the seven identified CashApp payments from Ms. Porter to Mr. Baylor, completed calls between Mr. Baylor's phone and Ms. Porter were observed on the same day, the day before, and/or the day after a payment was made. For example, on June 5, 2024, $200 was sent from Ms. Porter to Mr. Baylor within two minutes of a call. On June 21, 2024, $300 was sent from Ms. Porter to Mr. Baylor within twenty minutes of a call.

In addition to corroborating the information via records, investigators set up an undercover operation. In August 2024, a former FBI undercover employee ("Individual-1") was introduced to Inmate-1 over the telephone. Individual-1 claimed to be a major narcotics distributor based out of Detroit who regularly traveled to D.C. and could supply Inmate-1 with narcotics. Co-Conspirator-1 and Individual-1 developed a friendly relationship and had several phone calls. Eventually, they began arranging for Individual-1 to provide narcotics to be smuggled into CTF for Inmate-1.

On September 3, 2024, Individual-1 and Inmate-1 spoke telephonically on Mr. Baylor's office phone. Inmate-1 informed Individual-1 that "we can talk now, ain't got to worry about [expletive] now" and stated that he was in "office right now called from [his] counselor's phone." Informant-1 and Inmate-1 described a sale of marijuana and Percocet to an associate of Inmate-1 outside of DOC from which Inmate-1 would receive a portion of the profits. Additionally, Inmate-1 requested suboxone strips from Individual-1 that could be smuggled into CTF.

On September 12, 2024 and September 17, 2024, Individual-1 and Inmate-1 spoke via Mr. Baylor's office phone. On these calls, Individual-1 and Inmate-1 discussed a meeting between Individual-1 and an unnamed individual to take place on September 23, 2024, to provide that the unnamed individual with illicit narcotics would be smuggled into CTF on behalf of Inmate-1.

Inmate-1 stated that the unnamed individual facilitating the smuggling on Inmate-1's behalf, "wanted a certain amount to do what they do." Inmate-1 explained the cost for the aforementioned unnamed individual would be "a stack" and that "every time they moved they want[ed] a thousand." Based on experience, investigators understood that every time contraband was smuggled by the unnamed individual, he charged $1,000, which is what Individual-1 would need to pay to smuggle in narcotics on September 23, 2024.

On September 18, 2024, Individual-1 and Inmate-1 spoke telephonically on Mr. Baylor's office phone. On this call, the planned meeting between the unnamed individual and Individual-1 was again discussed. The contraband desired by Inmate-1, a quantity of "strips", was discussed and set to be delivered to the unnamed individual facilitating the smuggling on behalf of Inmate-1, who would bring it straight into Inmate-1. Individual-1 was further instructed that a payment should be made to the unnamed individual by Individual-1.

On September 19, 2024, Individual-1 received a call from Mr. Baylor. *See* Ex. 3. Mr. Baylor instructed Individual-1 to meet him around 10:00 AM on Monday, September 23, 2024. Individual-1 was instructed to "text" Mr. Baylor a description of Individual-1's car when he arrived, and that Individual-1 should park in front of the building. Individual-1 asked Mr. Baylor how he should package the items, and Mr. Baylor instructed Individual-1 to use "no metals" because he had to bring it "inside."

On September 23, 2024, Mr. Baylor met Individual-1 in the parking lot of CTF. *See* Ex. 4. Mr. Baylor accepted $1,000 in cash from Individual-1 and received a cigarette carton Mr. Baylor believed to be filled with Suboxone strips. Mr. Baylor confirmed several times with Individual-1 that there was no metal in the cigarette carton. Following the meeting with Individual-1, Mr. Baylor placed the $1,000 in his personal vehicle. He then put the cigarette carton inside his underwear. He went through security at the entrance to CTF and entered the facility. At that time, he was

5

arrested. The cigarette carton was recovered from Mr. Baylor and the $1,000 was recovered from Mr. Baylor's vehicle.



## II.     Sentencing Guidelines

The following guidelines provisions are not in dispute by the parties or the presentence report writer:

| Guideline | Description | Offense Level |
|---|---|---|
| § 2C1.1(a)(1) | Base Offense Level | +14 |
| § 2C1.1(b)(1) | More than one bribe | +2 |
| § 2C1.1(b)(1)(B), (b)(2) | Value obtained more than $6,500 and less than $15,000 | +2 |
| § 3E1.1(a) and (b) | Acceptance of Responsibility | -3 |
| § 4C1.1 | Adjustment for Zero-Point Offender | -2 |
| Total | | 13 |

PSR ¶¶ 27-29, 35-37. However, the parties disagree over whether an upward adjustment of four levels is appropriate pursuant to U.S.S.G. § 2C1.1(b)(3). The Government and the presentence report writer believe Mr. Baylor qualifies as a "public official in a high-level decision-making or sensitive position," while the defense does not. If Mr. Baylor is found to hold a high-level decision-making or sensitive position, the offense level is 17 and the applicable guidelines range is 24 to 30 months. If he did not hold such a position, the applicable guidelines range is 12 to 18 months.

<u>Mr. Baylor held a "sensitive position."</u>

Under U.S.S.G. § 2C1.1(b)(3), a four-level increase applies if the offense involves "any public official in a high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(3). The Guidelines commentary defines "high-level decision making or sensitive position" as "a position characterized by a direct authority to make decisions for . . . [a] government entity, or by a substantial influence over the decision-making process." U.S.S.G. § 2C1.1 cmt. n.4(B).

Courts have regularly held that correctional officers occupy sensitive positions because they "directly and significantly influence inmates' lives and the entire facility's safety with the decisions they make." *United States v. Guzman*, 383 Fed. Appx. 493, 494–95 (5th Cir. 2010); *see also United States v. Dodd*, 770 F.3d 306, 313 (4th Cir. 2014); *United States v. Grosso*, 658 Fed. Appx. 43, 46–47 (3d Cir. 2016). Further, correctional officers who accept bribes to bring contraband to prisoners endanger those inside and outside of the prison—thereby affecting their lives. *United States v. Love*, 710 F. Appx 351, 353 (11th Cir. 2017).

Importantly, courts have clarified that supervisory authority is not a prerequisite. Individuals in non-supervisory positions may also fall within the definition of "sensitive" if they possess meaningful discretion or authority in carrying out their duties. *See United States v. Zamora*, 982 F.3d 1080, 1085 (7th Cir. 2020) (upholding the enhancement where a low-level correctional officer, without supervisory authority, accepted bribes in exchange for smuggling contraband). The Seventh Circuit emphasized an employee's power and influence over inmates and capacity to use that authority for corrupt purposes is significant to considering whether they occupy a sensitive position under U.S.S.G. § 2C1.1(b)(3). *Id.*

As the Third Circuit explained in *Grosso*, corrections officers "wield[] the coercive power of the state to maintain order and safety among the populations [they] protect." 658 Fed. Appx. at

7

46–47 (internal quotation marks omitted). In *McCowan*, the court likewise upheld a four-level enhancement for a correction officer who accepted bribes to smuggle drugs, reiterating that by virtue of his position, the officer could "directly and significantly influence inmates' lives." *United States v. McCowan*, 464 Fed. Appx. 213, 216 (5th Cir. 2010).

By much of the same logic, a DOC case manager holds a sensitive position. Attached to this filing, the Court will find the job description for a case manager, along with the report from an interview with Mr. Baylor's former supervisor. Exs. 5 & 6. According to the job description, case managers "implement[] a planned program of institutional activities designed to meet the varied demands, individual needs, and abilities of an assigned caseload of inmates." Ex. 5 at 1. Practically speaking, Mr. Baylor's supervisor described caseworkers as an "advocate for inmates." Ex. 6 at 1. They conduct risk and need assessments for their assigned inmates and serve as liaisons between the inmates and other departments in DOC, as well as the community. Ex. 5 at 2. Additionally, they assist in determining the classification level of inmates and are responsible for re-evaluating inmates every 90 days. *Id.*

Here, the Fourth Circuit's reasoning in *Dodd* is instructive because the court held that correctional officers occupy a sensitive position, warranting the § 2C1.1(b)(3) enhancement, due to the inherent trust placed in them and the potential danger created when that trust is abused. *Dodd*, 770 F.3d at 312. In this case, Mr. Baylor, as a case manager, held a position of comparable sensitivity and trust. His contacts with inmates were designed, according to the official job description, to resolve problems and "motivate and/or influence" inmates. Ex. 5 at 4. Case managers also prepare reports based on observed behavior and compliance with facility rules which influence institutional decisions. As noted explicitly in the job description, a case manager's recommendations and decision "have the potential for serious impact on the inmate." Ex. 5 at 4.

8

And as indicated by Mr. Baylor's supervisor, case managers' opinions carry weight, and they are considered "positions of authority" at DOC.

This capacity to influence inmate outcomes places case managers squarely within the category of individuals occupying sensitive positions. Mr. Baylor's acceptance of bribes from an inmate demonstrates the very risk the enhancement is designed to address: a public official using their trusted position to subvert institutional order and security. As in *McCowan*, where the court referenced even the influence held even by an administrative aide, Mr. Baylor's ability to affect the lives and classifications of inmates is sufficient to trigger the enhancement. *See McCowan*, 464 Fed. Appx. at 216.

In sum, because Defendant held a position of trust within a correctional facility, possessed discretionary authority over inmates, and used that position to accept bribes, the four-level enhancement under U.S.S.G. § 2C1.1(b)(3) should be applied.

### III. The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(6).

Here, the factors weigh in favor of a guidelines sentence.

### A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Mr. Baylor's actions were undoubtedly serious. Mr. Baylor was entrusted to be an advocate on behalf of the detainees at CTF. He was charged with looking out for their safety, assisting in the goals of rehabilitation, and helping the detainees overcome challenges, such as substance abuse, that may have led to their detention. Instead, Mr. Baylor put his own financial gain above the safety of the detainees, contributing to a dangerous environment for residents and staff.

Furthermore, the frequency of the CashApp payments to Mr. Baylor suggest that these were not isolated incidents; the payments suggest he brought contraband into CTF on behalf of Inmate-1 dozens of times. While Mr. Baylor may have been willfully ignorant of what exactly was inside the cigarette cartons he smuggled into CTF, that is no excuse. Mr. Baylor's ignorance was a choice made easy by the fact that he was being paid thousands of dollars for his unlawful actions. Moreover, Mr. Baylor, as a case manager, was acutely of the vulnerability of the population of CTF with respect to substance dependencies. That, paired with the frequency of overdoses at the jail highlights the recklessness of Mr. Baylor's actions.

This factor favors a guideline sentence.

### B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct

Mr. Baylor is one of at least three DOC employees in the last year to be charged in connection with smuggling contraband into a DOC facility. DOC investigators have informed the Government that this has put the facility and its staff on high alert. As indicated by the audit of the D.C. jail, the flow of contraband into DOC facilities is a significant problem with lethal consequences. DOC is an insulated environment, and the Court's sentence in this case has the potential to serve the goals of general deterrence by putting all DOC staff on notice that this behavior is unacceptable. This factor heavily favors some period of incarceration, and a guidelines sentence is appropriate under the circumstances.

### C. The History and Circumstances of the Defendant

Based on the information available, Mr. Baylor has largely lived a productive and law-abiding life. He has worked in various roles as a social worker. That Mr. Baylor has devoted so much of his life to assisting vulnerable populations, makes Mr. Baylor's smuggling of contraband into CTF even more shocking. The Government is particularly concerned about Mr. Baylor's positive test for cocaine at the time of the interview with the presentence report writer. *See* PSR ¶ 64. The Government is concerned that addiction or substance abuse issues may have contributed to Mr. Baylor committing the instant crime. Accordingly, the Government requests that whatever sentence the Court ultimately fashions include substance abuse treatments.

### D. Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is

the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, "there were 78 defendants whose primary guideline was §2C1.1, with a Final Offense Level of 17 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 115. Only twenty-one percent of those defendants did not receive a sentence of imprisonment. "For the 62 defendants (79%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 16 month(s) and the median length of imprisonment imposed was 17 month(s)." PSR ¶ 115.

Here, this data suggests that a term of incarceration is appropriate for Mr. Baylor. The Government believes that a guidelines sentence, albeit higher than 17 months, is appropriate in this case. Mr. Baylor's violation of his official duties put the health and safety of the detainees at the facility at risk. That fact sets this case apart from a typical bribery case where §2C1.1 is applied. Additionally, it is worth noting that Mr. Baylor has admitted to conduct that amounts to Providing Contraband in a Prison, in violation of 18 U.S.C. § 1791(a)(1). Were he convicted of that charge, the guidelines would have been significantly higher. *See* U.S.S.G. § 2P1.2(c)(1).

## **CONCLUSION**

Mr. Baylor's conduct should not be taken lightly. The willingness of Mr. Baylor and other DOC employees to violate their official duties directly contributes to the pervasive and deadly presence of drugs and other contraband at DOC facilities. The presence of such contraband has led the DOC facilities to have a rate of overdose deaths that is 10 times the national average at U.S. jails. Mr. Baylor's actions have the potential for devastating consequences. A significant sentence

is warranted to deter others in positions of trust. The Government requests a sentence at the bottom of the applicable guidelines range, which the Government calculates to be 24 months incarceration.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


 /s/ *Joshua Gold*
Joshua Gold
Tx Bar No. 24103101
Assistant United States Attorney
United States Attorney's Office for D.C.
601 D Street NW,
Washington, D.C. 20530
E-mail: Joshua.Gold@usdoj.gov
Telephone: (202) 815-8965